May I proceed? Yes, you may, Counsel. Good morning. Good morning, Your Honor. My name is Tom Beck and I'm here for Mr. Feiman, also known as Harpo Marks. Harpo Marks. I've asked the Court of Appeal to look at this post-trial decision and the rulings that led us to the defense verdict because in my judgment, Mr. Feiman was denied a fair trial in numerous respects. I'd like to begin on the Court's least defensible and most injurious ruling, which was to... That's dispositive, but it's wrong. Is that what you're saying? The way I read Lyle and the way that that decision comes about is inconsistent with everything else that the prior decisions that I've cited in my briefs hold. And that's under your, is it Bain Act? It's a Bain Act, 52.1 civil code. And since this is a three-judge panel, we have to follow that. I guess it would be my understanding that absent en banc review of this, Lyle takes care of that claim. And I would have to not dispute that. Okay. All right. Then just go on to the other, go on to what you're talking, the most injurious. I'm sorry. I just want to... And that had to do with the assignment of five hours to try this complete case. That was an impossibility. With your discretion on that, counsel, wasn't that consistent with the PTL pre-trial order? The pre-trial conference order? Yeah. Well, counsel and I both requested prior to the PTCO that this case have up to a seven-day estimate in light of the number of issues and the number of witnesses that we both prepared to call. The court never consulted with us, as I think it should have. It should have had some sense from us as to why we thought those days estimates were appropriate. But we never got a chance to talk about it. The court said, virtually off the cuff... But when did you object? At the pre-trial conference. Okay. Let's assume that you did. At the end of five hours, what was your offer of proof as to prejudice, what you would have done? Well, the most important to me is Amber... What's your offer of proof? That's what I want to know. When the five hours hit, what did you say? We are prejudiced because we would have done X, Y, and Z. Did you even do that? Well, no, not orally. I did not. I preserved the objection in my post-trial motion. I explained to the court what was left from my witness list. The court will recall that I had a witness, a waitress, who I expected to appear on the morning of the second day of trial, who promised she'd be there, was under subpoena, and then when my law clerk went to get her, she just refused to attend. I could have cured that if I had additional time. That's one. Two, and she's an independent, unbiased witness on the issue... Did you say that to the court at the time when the five hours was up? Say, Your Honor, I could have cured that and I would have called that witness? Or did you just let it lie then? Well, no, no, I did not. In terms of her non-appearance, I did make some arguments about what the importance of that witness is and what I could do to cure it had I the time. That's in the record. As to Amber Findley, which I thought was a very important witness, because remember, Jailer Findley, on the videotape, communicates with Mr. Fineman at the jail, and she wrote out the initial medical screening form in which she refutes every allegation of objectivity. And we now know that Ms. Demas, the second jailer, went back and changed all of it. And I think that the probative value of her testimony would have been far more significant to hear it out of her mouth as to why she filled out that form and was asked to determine whether he smelled of alcohol, whether he had any objective symptoms, did his speech get thick and slurred, all the things that... Did you depose that witness? Did not. Okay. So if you deposed that witness and would say those things that you're saying right now and put that in the record, that would be a better argument for you, right? I could... The answer is yes. In hindsight, that's absolutely true. But I had a form that she filled out, and I knew that the jailer, the second jailer, the co-defendant, had actually changed. She admitted to changing it. Did you have a statement from an investigator as to what that witness would testify to? I had her form. The answer is no directly, but I had her document. And I thought that that was highly probative. Using that document and bringing that jailer to court and having that jailer explain to that jury why it was she answered those questions that way, in my view, was very, very prejudicial. Now, was that your offer of proof before the jury was discharged, or was that your offer of proof in your motion after? It was in the motion after. Okay. There was also three other important witnesses that I pointed out. After Mariani testified that Mr. Fineman was argumentative, aggressive, and belligerent, and took an aggressive stand toward what turned out to be CSO Castellanos, you see him shaking his hand on the videotape, I would have brought him in to refute what Officer Mariano claimed was Mr. Fineman's attitude. Did you make that offer of proof before the jury was discharged? I did not. Okay. And if you don't do that and you just wait until later, you know, you don't know what the trial judge would have done. The trial judge might have given you if, in fact, it was you had an offer of proof, but you didn't do it. That makes your pushing that rock uphill a little bit harder. I don't disagree with your assessment. However, it was obvious to me in the judge's comments throughout the trial, especially when I reached the five-hour limit, that he was going to cut me off no matter what I did. And that disclosure to me made it futile to discuss what I would have brought in. I did bring it in. I said I had these witnesses. There was a dispute over whether that bailiff showed up on day one. Should have testified. She did show up, but we hadn't picked a jury, so I sent her back and put her on call. And that ultimately precluded me from calling her. Let me turn to my second point, which I think is of second importance, which was the Baines claim. The dismissal under the summary judgment ruling was, in my view, erroneous because there was undisputed evidence of threats, intimidation, and coercion employed by Mr. Marioni, Officer Marioni, on the videotape. And at a minimum, it raised the tribal issue of that element of the claim. As to the Shoshoi argument, as I said a moment ago, Shoshoi was misapplied by the court, notwithstanding what's recently happened. The third argument, in my view of importance, has to do with the total lack of proof of incapacitation, which is a key point as to the 50 A and B rulings and on the jury instruction that all center on that key point. California law requires, case law does in any event, that a person to be arrested under 647F must be incapacitated by virtue of that inebriation. There was no evidence, and the defendant never testified or ever wrote that Mr. Feynman exhibited any signs of incapacitation. He doesn't use that word or any word close to it. He rests on his opinion and subjective conclusion that Feynman was unable to care for his safety or the safety of others. That's an unfounded conclusion in light of the evidence in the case. And I think that the court erred when it did not grant our, at a minimum, give us our jury instruction because on the face of the statute, you'd never know that incapacitation was the law. The language of the statute does not include that. And that's why I propose- The court gave the model jury instruction, correct? It gave the model within which it read the text of 647F. And my point was, and the instruction I proffered was, in addition to the text, you should apply what the case law says it means. That jury never understood that in California, an F arrest requires incapacitation. And it misled them effectively. So I think that that's a key issue. And then the last two have to do with Mr. Cardiel and Mr. Feynman's testimony, which I found absolutely incomprehensible. We're trying a false arrest for allegedly being drunk in public. And I have a former alcoholic, this religious proselytizer with whom he had some contacts. And it's undisputed off the videotape that he was prohibited from testifying that if Mr. Feynman was believed by him to be under the influence of anything, that if he smelled of alcohol, he would have recognized it. That if he was- What specifically? My understanding is the court said he could testify as a lay witness. He just couldn't testify as an expert. And I didn't. You're right. As a lay witness, he was still prohibited from giving the testimony. I mean, a lay witness can say, I know alcoholism when I see it. I know a drunk when I see it. I can smell alcohol. I know a person that behaves that way. And the case law supports me on that. The fact that the gentleman had a better understanding of what a public intoxication or an inebriated person might look like, smell like, and behave like, he was barred from testifying to. I find that absolutely incomprehensible. And then in Mr. Feynman's own case, I asked him, do you think that if you had been severely intoxicated, that he could run as you watch him cross with the heavy harp in his hand across Arizona Street? And I got a sustained objection to that, too. I mean, that, to me, tied my hands behind my back and denied my ability to prove my case and Mr. Feynman's claim fairly. Lastly, and I think it's of tertiary importance, is the damages testimony that Judge Grinnell excluded concerning the absence of a record. He'd never been arrested before or since, and that was damages testimony. With that, I'll reserve what time I have left. Thank you, Counsel. You have almost four minutes. We'll hear from the city. Good morning, Your Honors. Good morning. May it please the Court. Carol Ann Rohrer, Deputy City Attorney for the City of Santa Monica for Officer Marioni and Jailer Demas. I will not spend any time on Lyle based upon Your Honor's position that it is dispositive. The five-hour time limit. Well, I was there. I was there at the pretrial conference. Mr. Beck did not object to the five hours. I pointed that out. It was in the transcript. I ordered the transcript for the pretrial conference. He did not object to it. When I pointed that out to him at the podium, he acknowledged that he had misspoken, that he had objected to the five hours at the pretrial conference. So when we... I'm not sure I understand. Go ahead. Your reading of the record is that the first objection was in the subsequent motion after trial? His first... Objection to the five hours? Yes, except, first of all, at the pretrial conference, he did not oppose the five hours, and that's when Judge Bernal said five hours each side. Then we get to trial, and when we get to the end of his five hours, then he objects, this isn't enough time, Your Honor, and I need more time. I wanted to cross-examine their expert, and it was Mr. Cope, and Judge Bernal said, fine, you can cross-examine Mr. Cope. How much time do you need? Oh, I know him. I only need ten minutes, and then I put on our jail manager, and he had opportunity to cross-examine her, and I think only did for two minutes. He was given the opportunity to do that, and he made no offers of proof relative to Rios, relative to Amber Findley, relative to anyone else that he would have brought. Also... the comments that counsel made, saying I need more, I need time to cross-examine, how much over the five hours did the trial actually go? I believe he had an additional ten minutes with Mr. Cope. He could have had more. He just told the judge, oh, I know Mr. Cope, I don't need more than ten minutes, and then also the jail manager, and that was it. He had opportunity to... those were the only two additional witnesses that we were bringing, and he had opportunity to cross-examine them. Now, as I put in the record, regarding Amber Findley, I happened to be standing there outside of the courtroom when she appeared on the first day of trial, and she had been subpoenaed, and she was summarily, and in my opinion, rudely dismissed by plaintiff's counsel at that point because she had come to a subpoena that was for the first day of trial, and she had driven from LAPD all the way to Riverside, and she was sent away by Mr. Fineman's counsel, and I was not in the conversation, but I was privy to that conversation, and I watched her leave that courtroom, and, oh, she asked when, he said, I don't want you today. She said, well, can I have a note that I can take back and let them know that I came all the way out here, and he refused to give her a note. So who knows why he did not, Mr. Fineman's attorney, did not then pursue her as a witness. I don't know what his mental thoughts on that were. Potentially, maybe he had upset a witness that maybe he thought would have been a good witness. Was there any offer of proof at the close of the trial about that witness? Absolutely none. Also, Mr. Fineman said in the, Fineman indicates in the brief that he had contact with Amber Findley in the jail, but when I asked him about was it Amber Findley or Demas, he didn't know. So there's no direct proof that he actually had direct contact with her in the jail, so she could have testified. That's just an additional point. And likewise, he never deposed her and never made that offer of proof. As far as bringing on other witnesses, oh, Rios. Rios didn't appear, and we actually had downtime in the trial because everybody's sitting there waiting, and the judge is not real happy because we're not supposed to have downtime, and it is determined that the proof of service that was prepared was outdated, and it didn't include, I believe, it was a fee. It wasn't appropriate, and Judge Bernal said that Plaintiff's Counsel, at that point, could have opportunity to supplement that subpoena. Apparently, Plaintiff's Counsel never did, and Ms. Rios never appeared at trial. Neither was she ever deposed, and also no offer of proof was made at the end of the trial when Judge Bernal was listening to the request to cross-examine Cope and to cross-examine Jennifer Estrada, the jail manager. Also, Castellanos, who shook his hand, allegedly, in the jail video, it's hard to see in the promenade video who's shaking his hand, but Castellanos was never subpoenaed, and he was subpoenaed, but he was never called, and he was never deposed. Okay, let me ask you. Mr. Fineman's case appears to have turned on the reasonableness of Officer Marioni's belief that Mr. Fineman was incapacitated due to alcohol or drugs, right? Correct. Why didn't the trial court's limitation on the time for trial prejudice Mr. Fineman by limiting the number of officers he could call who disagreed with Officer Marioni's assessment of Mr. Fineman? Excuse me. You said that agreed with him? That limiting the number of officers he could call who disagreed with Officer Marioni's assessment of Mr. Fineman. I don't believe there were any officers that disagreed. Well, but isn't that what he alleges in his motion, right? But he has no evidence as to what they would have even said. All right, but I guess that's what he's saying, okay? That's what he's saying where he was prejudiced, right? But first you have your argument that he didn't object at the pretrial conference, that he didn't make an offer of proof at the trial. Those are all arguments, but let's just say we get over that hurdle. We actually look at his motion. Why wasn't he prejudiced by not allowing those witnesses? If we assume he gets over those. I'm just asking you to assume that. I don't believe he was because there's no evidence. There's anyone that would have testified contrary to Officer Marioni or Officer McCowan or Officer Chunn that there's no evidence of that. Also, he hadn't deposed them. He didn't know what they were going to be saying. And in managing the witnesses that put on, I did not count the time. I just know I was sitting there. Mr. Feynman was on the stand for a long, long, long time. And then the plaintiff called his other witnesses. He certainly, in those five hours, could have managed that time a lot better. Well, let me ask you about his, it was, I think, is it Cordial or what's the name of it? Cordial. Yes. So what was the court ruling on that and what was actually received into evidence? Okay. I actually brought the brief that on page 40 begins the questioning that the court allowed. Well, what was the court's ruling? What did the court say that that witness, there was a motion in limine, correct?  And what was the court's ruling? The court ruled that he would not be allowed to testify that he would have known plaintiff was intoxicated. That he would have known he was intoxicated. I knew he was intoxicated. He wasn't going to be able to say that. Well, he wasn't going to say that anyway, right? It was possible. Mr. Cordial was a preacher from the Third Street Promenade. He was very vociferous. He said he could testify as a lay witness. Now, what could he testify to as a lay witness? It was my understanding the court distinguished between a lay witness and an expert witness. Yes. The court permitted lay. It isn't quite making sense to me. Okay. The court allowed lay opinion testimony if it is rationally based upon the perception of the witness, helpful to the fact finder, and does not involve scientific, technical, or specialized information. The court noted in the motion and ruling that lay witness testimony about whether someone appeared intoxicated is generally admissible. Right. Like I can say someone's drunk. I mean, I can be cross-examined about that, but a lay witness can say that. What the court allowed, as opposed to saying, I know he was intoxicated. Starting on page 40 of our brief, there are 13 questions that Mr. Beck was allowed to ask of Mr. Cordial. For example, in your dialogue with him, was there anything to suggest to you that his speech was thick or slurred? No. Was there any indicia about his person that would suggest he was impaired in any manner? I objected, leading, and the court said, you may answer, and the witness said, not that I recall. Then Mr. Beck asked, do you have some experience in identifying drunks? Yes. And then at this point, I objected, and the court said, let's get to the symptoms, Mr. Beck. I don't want to elicit any kind of expert opinion from this person, so let's just get to the symptoms. Then Mr. Beck asked, was there anything about his manner in your presence that suggested he needed something to stand up to support himself? No. Mr. Beck, did you smell alcohol on the person of this man in any degree? Answer, not that I recall. No. Question, are you familiar with the scent of alcohol, sir? Answer by Mr. Cardio, yes. Question by Mr. Beck, do you drink alcohol or did you once in your life? Answer, yes. Question by Mr. Beck, did Mr. Fineman speak with slurred speech? Answer, no. Mr. Beck, a thick tongue? Answer, no. Mr. Beck, slowly, deliberately? Answer, as clear as any normal person you know would speak. Question by Mr. Beck, can you approximate, did he have like bloodshot or watery eyes? Answer, I don't remember that. By Mr. Beck, was he agitated and behaved like he was agitated? Answer, a little strange, like anybody else that's down there that I deal with, you know. The answer is, you know, people don't like, and he talks about his preaching. Question by Mr. Beck, did you perceive him as being threatening or hostile? No. So, he was able, instead of saying, I would have known he was intoxicated, he was able to go through each observation that one could possibly make to, in their... I thought lay witnesses, though, could say whether someone was drunk or not. I thought that's what the law said. As a lay witness, you can say whether someone's drunk or not. I mean, obviously, it's, the issue really resolves around what that officer thought when he arrested him. However, if he thought he wasn't drunk, why couldn't he say he wasn't drunk? I believe the distinction was that he wanted his honor, did not allow him to say that he would have known he was intoxicated. Known, as opposed to, oh, that person appeared intoxicated, but to say that you knew he was intoxicated. Okay, so you couldn't form a conclusion as to an absolute fact in the case, but you could have an opinion of whether they're drunk or not, right? Was he, wasn't allowed to say, I thought a lay person could say he was drunk. I believe that's what the 14 or 13 questions were allowed for him to describe everything possible regarding his intoxication. Well, yeah, okay, all right. And there were individuals that smelled alcohol on his breath, and Mr. Cardial was able to go through what he saw, what he smelled, what he heard, and describe the entire scenario. Thank you, Counselor, your time has expired. Thank you. Mr. Beck, you have some reserve time. Thank you. The most effective testimony Mr. Cardial could have given was the punchline, I'm a drunk, a former drunk, that man was not drunk. The case law doesn't say that he's got to be an expert to say such things. Case law, in fact, says that it's not expert testimony at all, and it's not technical, clearly. I had the good fortune of having a person who had this experience in the past, and I felt that that would have been very effective if he'd been allowed to simply come to the conclusion and state that this man was not intoxicated. Counsel? Yes. Judge Rollins, what's the strongest case you have for the proposition that someone can say definitively that an individual is or is not intoxicated, as opposed to giving an opinion regarding whether or not the person is or is not intoxicated? What's your strongest case? Well, I can't cite it to you right away off the top of my head. I've briefed it. There are several cases that take that position, and I would ask the court to take a look at the brief, because I didn't memorize the cases. I also want to address the time element. While it is true that I didn't make an objection to the five hours when it was sprung on us at the pretrial conference, there's no doubt that in the record there was an objection preserved, and I raised it throughout the trial when I was running out of time. Cite me to the record. I can't. Off the top of my head, Your Honor. I'm sorry. But it's there. I mean, it's in the brief. I made sure that it was there, and there is an ongoing colloquy between myself and Judge Bernal at various points along the way concerning the fact that I was feeling being rushed and that I needed more time. And the ten minutes he gave me for cross-examining, the additional ten minutes he gave me for cross-examining their defense expert, I got ten minutes worth of cross-examination. That's not very effective. And two minutes with their jailer, which was a tertiary issue in the case in any event. Did you ask for more time with those witnesses? No. I took what I got. I asked for ten minutes. I got ten minutes. But that doesn't address the issue that's here, and that is I had at least three other important witnesses, perhaps four, that I couldn't possibly put on because I was given five hours by stopwatch to try the case. I mean, I'm looking at this clock here, and this is the way I felt during the trial, throughout the whole thing. That was a huge burden on me as an experienced trial lawyer trying to get this case to the jury on a treadmill. And I don't think that was fair, and I don't think it was right. And it obviously hurt the plaintiff. That's all I have to say. Thank you, counsel. The case just argued will be submitted for decision.
judges: O'scannlain, Rawlinson, Callahan